## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

MAXINE Y. DESANZO             )
                                      )
          Plaintiff,              )
                                      )
          v.                   )     Case No. 18-CV-352-JED-JFJ
                                      )
AHS SOUTHCREST HOSPITAL, LLC,   )
                                      )
          Defendant.         )

## OPINION AND ORDER

Plaintiff Maxine DeSanzo alleges that Defendant AHS Southcrest Hospital, LLC, violated the Age Discrimination and Employment Act by suspending and then firing her because of her age. Southcrest moves for summary judgment on all claims. (Doc. 52).

## I.    BACKGROUND

Ms. DeSanzo was a nurse in Southcrest Hospital's postpartum unit. The hospital hired her in 2009 and promoted her to the position of charge nurse in 2012. In 2014, DeSanzo moved to the night shift and began working the "weekend option," an arrangement where nurses who agreed to work a certain number of weekends each year could earn a substantially higher hourly rate.

For most of her time at Southcrest, Ms. DeSanzo had a clean disciplinary record, but that began to change in 2016 after her longtime supervisor, Krista Fouke, resigned and DeSanzo's unit came under the supervision of India Jackson. Ms. Jackson answered directly to Jaime Heitgrass, who had been director of nursing operations since 2013. Shortly after Jackson took over direct supervision of Ms. DeSanzo's unit, she became the subject of steadily escalating disciplinary interventions.

On August 5, 2016, Jackson called DeSanzo into her office and reprimanded her for filling out patients' charts after she had already clocked out rather than in real time during her rounds as

required. (Doc. 52-1 at 47–48). Jackson later memorialized the reprimand in a formal Disciplinary Action Record dated September 1, 2016. DeSanzo signed off on the action, which stipulated that she would "chart in real time and not wait until end of shift to chart on patients." (Doc. 52-1 at 47).

On September 12, 2016, Jackson issued a written warning to Ms. DeSanzo after a patient, "L.Y.," and her physician reported that the patient's pain had been allowed to increase unchecked during Ms. DeSanzo's shift. (Doc. 52-2 at 53). The Disciplinary Action Record's "explanation of offense" said she was being reprimanded because "Patient and physician reported that [Ms. DeSanzo] did not ask the patient [about] her pain rating during the night. The patient's pain was not controlled when the day shift [nurse] arrived." (Doc. 52-2 at 53). This time, Ms. DeSanzo refused to sign and appended a note arguing that she could not adequately defend herself because her supervisors would not tell her the name of the patient.

A few weeks later, on October 2, 2016, a nurse reported another patient complaint to Heitgrass and Jackson. According to the nurse, patient "C.H." complained that DeSanzo "was talking to her in a condescending manner" and requested that DeSanzo be reassigned. (Doc. 52-2 at 56). According to the nurse, it was "the 3rd or 4th patient that I have had in the last 12 months that has told me that she [does] not want [Ms. DeSanzo] back as their nurse."[1] Ms. Jackson called the patient to find out more information, but the patient never called back. (Doc. 52-2 at 57). Despite the lack of confirmation from the patient, Jackson emailed Heitgrass on October 3rd and recommended that DeSanzo be suspended, demoted from her charge nurse position, and removed

---

[1] Ms. DeSanzo objects to the nurse's email on hearsay grounds. The Court overrules with the caveat that it considers the email only as evidence offered to show that Ms. Jackson received the nurse's report. The Court does not consider the email to be evidence of the nurse's substantive claims (i.e., that Ms. DeSanzo was the subject of multiple prior complaints or that C.H. had actually complained to the nurse who sent the email).

from the weekend option. (Doc. 52-2 at 38). Heitgrass and Rachel Steward, the human resources director, signed off on the disciplinary action on October 5th. (Doc. 52 at 55).

On October 10, 2016, after DeSanzo completed her suspension, she submitted a letter to Steward requesting to be reinstated to charge nurse and to the weekend option. (Doc. 64-25). In her letter, Ms. DeSanzo alleged that Heitgrass and Jackson were singling her out because of her age, citing several nurses whom DeSanzo believed had been treated less harshly for similar or more serious infractions.[2]

After receiving the complaint, Ms. Steward investigated Ms. DeSanzo's allegations and concluded that Ms. DeSanzo's supervisors had properly documented the infractions leading up to the suspension and demotion and that Ms. DeSanzo was not being singled out. (*See* Doc. 52-4 at 21–33, 40). Ms. Steward reported these findings to Ms. DeSanzo on December 12 in a letter. (Doc. 64-26).

On March 20, 2017, a third patient complained to Jackson about Ms. DeSanzo's demeanor. According to patient "V.P.," Ms. DeSanzo was disrespectful and refused to address several of the patient's concerns, including a request to be removed from the patient-controlled analgesia machine. (Doc. 52-2 at 31–32, 59). After Ms. DeSanzo wrote a lengthy rebuttal addressing each of V.P.'s complaints, management took no formal disciplinary action. Instead, she was "[c]oached that the patient's perception is reality." (Doc. 52-2 at 60).

On March 27, 2017, DeSanzo received a written warning, again for staying after her shift was complete to finish charting. (Doc. 52-1 at 49). After receiving the warning, Ms. DeSanzo wrote a handwritten "rebuttal" and asked that it be added to the file. (Doc. 52-1 at 50). In it, she

---

[2]    On November 16, 2016, DeSanzo made the same allegations in an intake questionnaire submitted to the Equal Employment Opportunity Commission. (Doc. 64-27).

renewed her age-discrimination complaint and said that she felt the write up was retaliation for her having filed a complaint with the EEOC. Again, she said that younger nurses were not being disciplined for similar conduct.

The final domino fell on May 8, 2017, when Patient "R.G." and her husband complained to a nurse about several aspects of Ms. DeSanzo's customer service and care, and the nurse passed along the complaint to Jackson in an email. According to the email:

- The husband had complained to DeSanzo that the bed squeaked, but DeSanzo said that the patient could not have a new bed because the hospital was not buying new beds until the following year because there was no money in the budget.
- When Ms. DeSanzo could not get the IV machine to stop beeping due to air in the line, she said she would ask the patient's doctor if the IV antibiotics were really necessary so that the IV could simply be removed.
- After the patient's robe became soiled with blood, DeSanzo said that she could give only one per patient and that the patient would have to take it home to wash.

(*See* Doc. 52-2 at 62). Jackson followed up with the patient, and Heitgrass followed up with R.G.'s doctor. When asked for her side of the story, Ms. DeSanzo said that the patient never requested a new robe or bed and that the IV antibiotics were halted at the doctor's order. (Doc. 52-2 at 61). Heitgrass nevertheless recommended termination because "this complaint came after several coaching sessions on customer service and also written warning and suspension for customer concerns." (Doc. 52-2 at 61). Ms. DeSanzo was fired on May 19, 2017.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure  materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be

viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 32–23 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex,* 477 U.S. at 322–23. If the movant carries this burden, the nonmovant must "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson,* 477 U.S. at 248; *Celotex,* 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

In addition to the requirements of Rule 56, local rules in this judicial district provide that a nonmovant's response brief "shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist," and "each fact in dispute shall be numbered [and] shall refer with particularity to those portions of the record upon which the opposing party relies." LCvR56.1(c). Ms. DeSanzo's response fails to conform to these rules. Rather than offer factually supported denials of specific claims made by the defendant, she makes blanket denials to many factual claims at once by way of lengthy rebuttals, some spanning several pages. Often, many of the facts Ms. DeSanzo purports to deny are not actually disputed by the facts she cites in her rebuttals. Nevertheless, the Court has done its best to identify any genuinely

disputed facts and construes the evidence in the light most favorable to Ms. DeSanzo, drawing all reasonable inferences in her favor.

## III.  DISCUSSION

Ms. DeSanzo's petition brings three claims for relief. (*See* Doc. 2-1 at 10–12). First, she claims that Southcrest disciplined and fired her because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. 621 *et seq.* Second, she claims that Southcrest fired her in retaliation for her complaining to the hospital's human resources department and, ultimately, to the Equal Employment Opportunity Commission.[3] Finally, Ms. DeSanzo brings a state-law tort claim for intentional infliction of emotional distress, alleging that the hospital's "intentional and malicious discrimination" was "extreme and outrageous." (*Id.* at 13). The Court addresses each of the claims below.

### A.  Age Discrimination

The Age Discrimination in Employment Act ("ADEA") provides that it shall be unlawful for an employer to "discharge . . . or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, *because of such individual's age.*" 29 U.S.C. § 623 (emphasis added). To succeed on an ADEA claim, a plaintiff must ultimately prove that age was the "but for" cause of the adverse employment action. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010). The ADEA, like other anti-discrimination statutes, requires the plaintiff to prove that his protected characteristic (age) was the determining factor leading to the adverse employment decision, even if other factors may have also played a role. *See id.* at 1277–78.

---

[3]     Ms. DeSanzo's petition erroneously asserts her retaliation claim as a Title VII violation rather than an ADEA violation. The Court continues to construe the claim as having been brought under the proper statutory scheme. (*See* Doc. 62).

Where, as here, a plaintiff seeks to prove discriminatory intent through circumstantial evidence, courts apply the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir. 2000). Under this framework, the plaintiff bears an initial burden to establish a prima facie case for discrimination by showing (1) that she was a member of a protected class, (2) that she suffered an adverse employment action, and (3) that the challenged action occurred under circumstances giving rise to an inference of discrimination. *Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

If the plaintiff establishes a prima facie case of discrimination, a presumption of discrimination arises and the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for its decision. *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). If the employer proffers a legitimate reason, the employee then must prove, by a preponderance of the evidence, that the employer's explanation is merely a pretext for unlawful discrimination. *Id.*

### 1.    Prima Facie Case

The first two prongs of the prima facie case are not in dispute. Ms. DeSanzo was within the protected class (she was 64 years old as of the date of her termination), and she was the subject of two identifiable adverse employment actions—namely, her October 2016 suspension and demotion, and her May 2017 discharge. Thus, in order to make out a prima facie case, DeSanzo need only come forth with some facts showing that these actions occurred under circumstances giving rise to an inference of discrimination. The Court finds that Ms. DeSanzo has fulfilled her burden.

In termination cases, a plaintiff may supply the necessary inference by showing that she was "performing satisfactory work" and replaced by a younger person. *See Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1146 (10th Cir. 2008). In determining whether the plaintiff was performing satisfactory work, courts are not to consider the defendant's evidence. *Ellison v. Sandia Nat'l Labs.*, 60 F. App'x 203, 205 (10th Cir. 2003) (citing *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991)). Rather, a plaintiff may show that she was performing satisfactory work by producing credible evidence that she continued to possess the objective qualifications she held when she was hired, by her own testimony that her work was satisfactory, or by evidence that she held her position for a significant period of time. *MacDonald*, 941 F.2d at 1121.

Ms. DeSanzo, who held her job with Southcrest for eight years and has four decades of nursing experience, has shown that she was performing satisfactory work for the purposes of presenting a prima facie case. Southcrest, however, argues that DeSanzo has not shown that she was replaced by a person young enough to give rise to an inference of discrimination. (*See* Doc. 67 at 4).

The Supreme Court has held that an inference of discrimination cannot be drawn from the replacement of one employee with an "insignificantly younger" employee. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). While the Tenth Circuit has held that a two-year age difference is "obviously insignificant," *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000), it has declined to adopt a bright line rule on the issue. *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 996 (10th Cir. 2005) (refusing to adopt a "definitive five-year rule" and declining to follow other circuits that have "establish[ed] a direct-evidence requirement when the age difference is less than five years").

Here, it is undisputed that the hospital covered Ms. DeSanzo's shift with a variety of other nurses on an ad hoc basis for about two months and then hired a permanent replacement who was sixty at the time of her hiring, about four years younger than Ms. DeSanzo. In the absence of a bright line rule, the Court finds in this case that an age difference of four years is sufficient to support the necessary inference of discrimination.[4] *See T*ex. *Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). (describing the plaintiff's burden at the prima facie stage as "not onerous"); *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (describing the burden as "de minimis").

The Court further finds that Ms. DeSanzo's suspension and demotion also occurred under circumstances giving rise to an inference of discrimination. The October 2016 offense that led to her suspension and demotion served as a predicate offense to her eventual termination less than a year later. Consequently, the inference of discrimination raised by the circumstances of her termination also apply to her suspension and demotion.

### 2. Legitimate, Nondiscriminatory Reason

Southcrest asserts that Ms. DeSanzo's discipline was the result of successive patient complaints. (Doc. 53 at 23). More specifically, Southcrest asserts that: (1) on September 12, 2016,

---

[4] The Court notes that, although replacement by an older or insignificantly younger employee usually extinguishes any inference of discrimination raised by the termination of a qualified employee, that logic does not follow here. By the time the hospital hired Ms. DeSanzo's replacement, the hospital was well aware that Ms. DeSanzo was filing a charge of discrimination with the Equal Employment Opportunity Commission. Given this timing, a juror might reasonably interpret the hospital's decision to hire a relatively older employee as an attempt to mitigate its liability rather than as evidence that the hospital lacked a discriminatory motive. Thus, although the Court finds that Ms. DeSanzo's replacement is young enough to establish the inferrence, there is a strong argument that the usual rule requiring replacement by a younger employee should not apply. In race discrimination cases, the Tenth Circuit has held that, when the position in question has not been eliminated, termination of a qualified minority is enough to establish the necessary inference. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1229 (10th Cir. 2000); *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).

the hospital issued a written warning to DeSanzo in response to complaints by patient L.Y. and her doctor that DeSanzo failed to properly control L.Y.'s pain; (2) on October 5, 2016, the hospital suspended Ms. DeSanzo for three days and demoted her from the position of charge nurse after patient C.H. complained that Ms. DeSanzo was condescending and asked that Ms. DeSanzo be reassigned; and (3) the hospital terminated Ms. DeSanzo on May 19, 2017 after patient R.G. complained about Ms. DeSanzo's poor care and rude demeanor.[5]

Because poor performance is a legitimate, nondiscriminatory reason for applying discipline and the defendant has come forward with evidence supporting each of the stated justifications, the Court finds that Southcrest has satisfied its burden of production. As a result, the defendant will be entitled to summary judgment unless Ms. DeSanzo has come forward with evidence creating a genuine factual dispute as to whether the hospital's stated reasons for the discipline were pretext. *See Bennett*, 792 F.3d at 1266–67, 1268–69.

### 3. Pretext

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Bennett*, 792 F.3d at 1266–67 (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The plaintiff may establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the

---

[5] Southcrest's brief gives the date of her termination as May 17, 2017, (Doc. 53 at 11, ¶ 81), but this appears to have been in error. The Disciplinary Action Record documenting the termination was signed May 19th. (Doc. 52-2 at 61).

asserted non-discriminatory reasons." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010).

Here, Ms. DeSanzo alleges that the hospital "singled her out in an effort to advance its desire for a youthful staff, papering her file with unwarranted disciplinary actions to support her unlawful discharge." (Doc. 64 at 30–31). In support of this claim, she argues variously that (a) Heitgrass harbored an ageist agenda, (b) that the hospital treated her more harshly than younger nurses who were similarly situated, and (c) that the disciplinary actions taken against her were unwarranted or otherwise contrived. (*See* Doc. 64 at 31–35).

### a.  Heitgrass's Allegedly Ageist Agenda

Ms. DeSanzo claims that her demotion and termination were part of a larger purge of older nurses orchestrated by Ms. Heitgrass, Southcrest's director of nursing operations. This assertion rests entirely on the declaration of Ms. Fouke, Ms. DeSanzo's former supervisor. In her declaration, Ms. Fouke states that, when discussing her "ideal unit staff," Ms. Heitgrass would remark how she "wanted the staff to display [a] 'young, spunky, and youthful atmosphere.'" (Doc. 73-2). Furthermore, she says,

> [a]ny one [sic] that didn't fit that model was targeted by her. This applied to the previous Labor & Delivery Clinical Coordinator (Laura Mangile) and previous NICU/Nursery Clinical Coordinator (Jan Murphy) as well, along with several others that no longer work within that department. She would present multiple write ups or pressure staff to make them leave in fear of their job.

(Doc. 73-2). Additionally, Ms. Fouke states that Heitgrass "focused on [Ms. DeSanzo] staying over schedule shift to chart nursing notes," but misconduct by a younger nurse (*see* Christel Byrom discussion, *infra*) "seemed to go unnoticed." (Doc. 73-2).

Ms. Fouke's testimony is insufficient to show that Ms. DeSanzo's termination was animated by Ms. Heitgrass's allegedly ageist agenda. The Court takes as true Ms. Fouke's claim that Ms. Heitgrass said she wanted the staff to display a "young, spunky, and youthful

atmosphere," but this statement is insufficient to support a finding of pretext. Ms. Fouke provides no information about the context in which Ms. Heitgrass made the statements in question, and the statement does not necessarily express a preference for younger nurses, merely a "youthful atmosphere." Such an isolated and ambiguous statement is too abstract to support a finding of age discrimination. *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). In order to qualify as evidence that an employment decision was motivated by impermissible bias, a plaintiff must show some nexus between the statement and the adverse employment action. *Id.* Here, there is no information whatsoever about when Ms. Heitgrass made the comment or to whom she made it, so it is impossible to evaluate whether such a nexus exists.

Ms. Fouke's statement that Ms. Heitgrass targeted "any one [sic] that didn't fit the model" is also insufficient to support an inference of discriminatory animus. For one, an employee's subjective belief that the employer discriminated against the plaintiff is not sufficient to preclude summary judgment unless the statement is supported with specific examples of unlawful discrimination. *Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000). Here, Ms. Fouke's statements regarding the alleged forcing out of Ms. Murphy and Ms. Mangile lack sufficient specificity to serve as examples of discriminatory conduct. Threadbare allegations of disparate treatment with no context or specifics do not create a genuine factual issue. *See Bird v. W. Valley City*, 832 F.3d 1188, 1206 (10th Cir. 2016) (plaintiff's claim that "some of the men don't work as hard but never get in trouble for it" was not evidence of discrimination because it provided "no indication as to who got in trouble, for what, or in what way").

Moreover, the Court must disregard Ms. Fouke's claims that Ms. Heitgrass targeted Ms. DeSanzo and others because of their age. A declaration used to oppose a motion for summary judgment must be made on personal knowledge and set out facts that would be admissible in

evidence. Fed. R. Civ. P. 56(c)(4). Ms. Fouke resigned in April 2016, so she was already gone when Ms. DeSanzo was disciplined, and Ms. Fouke's declaration lays no foundation establishing her personal knowledge of the circumstances under which Ms. Murphy and Ms. Mangile ended their employment. Furthermore, even if the requisite personal knowledge had been established, Ms. Fouke's opinion that they and Ms. DeSanzo were being targeted because of their age would be inadmissible under Federal Rule of Evidence 701. *See Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("We follow . . . other circuits, and hold that in an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.").

Finally, even if Ms. Heitgrass did harbor some demonstrable age animus, she was not the only decision maker, or even the primary one, regarding the disciplinary actions at issue. When multiple decision makers are involved, courts are reluctant to find a genuine issue of material fact regarding discriminatory intent where the plaintiff has come forward with evidence of bias against only one of the decision makers and produced no evidence showing that the biased decision maker influenced the other decision maker. *See, Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066–67 (7th Cir. 2003); *Blair v. Atlanta Gastroenterology Assocs.*, No. 1:05-CV-2811-TWT, 2007 U.S. Dist. LEXIS 48556, at *25 (N.D. Ga. July 2, 2007). Here, each of the disciplinary actions taken against Ms. DeSanzo began with Jackson, Ms. DeSanzo's direct supervisor, not Ms. Heitgrass. Ms. DeSanzo provides no evidence that Ms. Jackson harbored any age bias or that Ms. Heitgrass directed Ms. Jackson to "gin up" reasons to discipline Ms. DeSanzo.

### b.    Disparate Discipline

In addition to the alleged age bias of Ms. Heitgrass, Ms. DeSanzo seeks to establish pretext by offering evidence that she was disciplined more severely than younger coworkers. (*See* Doc. 64 at 29). Disparate treatment may provide evidence that a defendant's stated justification was

pretextual, but only if the employees in question were similarly situated in all relevant respects. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). To be similarly situated, employees ordinarily must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline." *Id.* (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). A court should also compare the relevant employment circumstances, such as work history and applicable company policies. *Id.* Even employees who are similarly situated must have been disciplined for conduct of "comparable seriousness" in order for their disparate treatment to be relevant. *Id.* None of Ms. DeSanzo's proffered comparators provide a legally relevant comparison.

### i. Christel Byrom

Ms. DeSanzo argues that Ms. Heitgrass "singled [her] out while failing to discipline a substantially younger nurse, Christel Byrom, for more serious offenses, including falsifying nurse charting." (Doc. 64 at 23–24, 30). The closest thing to "falsifying nurse charting" in Ms. Byrom's disciplinary record consists of a written warning she received for "us[ing] white out on a discharge summary of another patient's discharge, cutting off top of information of another patient." (Doc. 64-36). Such a sparse description of the misconduct makes the writeup useless for the purposes of comparison. Her other two disciplinary actions were for attendance issues, not misconduct, and are therefore totally irrelevant for the purpose of showing disparate treatment.

Ms. DeSanzo deploys the Fouke declaration in an attempt to bolster her argument that supervisors turned a blind eye to Byrom's alleged falsification of charting notes. According to Ms. Fouke, on the day she resigned, Ms. DeSanzo gave her a note "stating information regarding false documentation by [an]other nurse (Christel Byrom)." Before her departure, Ms. Fouke gave the letter to Ms. Heitgrass. (Doc. 73-2). According to Ms. Fouke, this was not the first time she had

complained about Ms. Byrom, having previously reported "multiple concerns" about the nurse to Heitgrass. (Doc. 73-2). These reports, however, "seemed to go unnoticed." (Doc. 73-2).

As evidence of disparate treatment, these allegations suffer from the same defects as the ones Fouke made about Ms. Heitgrass's treatment of older nurses. Although Ms. Fouke has the personal knowledge necessary to testify that Ms. Heitgrass received the letter, Ms. Fouke cannot testify as to what Heitgrass did or did not do with the letter after she received it. By the same token, Ms. Fouke's statement that previous complaints about Byrom "seemed to go unnoticed" is too vague and conclusory to create a genuine issue of material fact. *See Bird v. W. Valley City*, 832 F.3d 1188, 1206 (10th Cir. 2016).

Moreover, even if the Court were to assume that Ms. Heitgrass knew about Ms. Byrom's alleged misconduct but failed to act, that misconduct is only nebulously described in Fouke's declaration, and the Court was unable to find any details about the alleged falsification of nursing notes in the record. With no specifics as to the allegations that Fouke passed on to Heitgrass, the Court has no means by which to determine whether Byrom was "similarly situated" for the purpose of showing pretext.

*ii.    Haley Meredith*

Ms. DeSanzo offers Haley Meredith as a comparator for the purposes of the written warning Ms. DeSanzo received on September 12, 2016, which the hospital issued after patient L.Y. and her doctor complained that Ms. DeSanzo failed to monitor L.Y.'s pain levels. (*See* Doc. 64 at 28–29).

Ms. Meredith was a 41-year-old licensed practical nurse at the time of the incident and also provided care to L.Y. the night L.Y.'s pain was allowed to escalate unchecked. According to the patient's Care Report, Ms. DeSanzo visited L.Y. at about 8 p.m. and conducted a pain assessment during which L.Y. reported a pain level of zero. (Doc. 64-21 at 3). DeSanzo visited L.Y. again at

11 p.m. Although the Care Report shows neither a pain assessment nor the administration of any pain medication during that visit, another medical record—a "Medication Administration Report"—suggests that DeSanzo administered a dose of pain medication shortly after 11 p.m. (Doc. 64-21 at 8). Meredith visited L.Y. at 4 a.m. and conducted a pain assessment during which L.Y. reported a pain level of four. (Doc. 64-21 at 7). By the time DeSanzo visited again, about 6 a.m., L.Y. reported a pain rating of nine.

Ms. DeSanzo argues that this is evidence that the hospital favored younger nurses because both she and Ms. Meredith provided care, but only DeSanzo was disciplined for the failure to control the patient's pain. This argument fails to account for several undisputed facts in the record.

For one, nobody complained about Ms. Meredith, and she was not the nurse assigned to that patient. Accordingly, it is not surprising that Ms. Meredith was not the subject of the hospital's investigation. Furthermore, the two nurses had different roles and responsibilities. DeSanzo held the senior position of charge nurse and was the actual nurse to whom L.Y. was assigned. (Doc. 52-3 at 18). Meredith was merely a licensed practical nurse who assisted with L.Y.'s care by paying a visit during rounds. According to Heitgrass, because L.Y. was assigned to DeSanzo, DeSanzo held ultimate responsibility for controlling the patient's pain, even if Meredith visited the patient while doing rounds. (Doc. 52-3 at 18). As charge nurse, Ms. DeSanzo could have reassigned the patient if she did not have time to properly monitor the patient's pain level. (Doc. 52-8 at 3). Ms. DeSanzo points to no evidence in the record to dispute Heitgrass's statements regarding who was responsible for ensuring that L.Y.'s pain was held in check.

Because their circumstances were materially different, Ms. DeSanzo and Ms. Meredith were not "similarly situated" for the purposes of a disparate-treatment comparison. Consequently,

the hospital's decision to issue a written warning to Ms. DeSanzo but not to Ms. Meredith does not show evidence of pretext.

### iii. Giselle Braswell

Ms. DeSanzo argues that the hospital treated her less favorably than Nurse Giselle Braswell in two ways. First, Ms. DeSanzo argues that the written warning she received after L.Y.'s complaint was disproportionate when compared with the hospital's response to a complaint made against Ms. Braswell in March 2016. (*See* Doc. 64 at 21, 25, 32). According to an informal note in Ms. Braswell's disciplinary file, the patient accused Braswell of releasing the patient's baby to an unauthorized person instead of taking the trouble to bring the baby to the patient herself. (Doc. 64-9 at 2). The hospital's investigation of the incident ended in verbal coaching rather than a formal writeup. (*Id.*). As Ms. DeSanzo and Ms. Brawsell were both the subject of a patient complaint, but only Ms. DeSanzo received a written warning, Ms. DeSanzo argues that the more favorable resolution of Braswell's case is evidence of the hospital's ageist animus.

This argument ignores the fact that Braswell's supervisors investigated the allegation and determined that she never released the infant to an unauthorized individual. (Doc. 52-4 at 9). The complaint was deemed unfounded. Jackson and Heitgrass gave the verbal coaching because they determined through their investigation that Braswell needed to improve her communication with patients. (Doc. 52-2 at 65). It is axiomatic that a nurse whose complaint was unfounded is not "similarly situated" to a nurse whose complaint was substantiated. Again, the comparison is not legally relevant, so the differing outcomes lead to no inference of discrimination.

Ms. DeSanzo also argues that her suspension, which the hospital meted out after patient C.H.'s complaint, was disproportionate when compared to the punishment Braswell received for yelling at a patient. (Doc. 64 at 29–30). Rather than suspend Braswell, as it had done with Ms. DeSanzo, the hospital issued Braswell a written warning.

Yet again, Ms. DeSanzo's argument ignores material differences in the circumstances surrounding the two actions. The hospital suspended and demoted Ms. DeSanzo because, Ms. DeSanzo, having previously received a written warning due to a patient complaint, was the subject of a second patient complaint. Braswell, by contrast, had never received a warning due to a patient complaint. The prior complaint against her was determined to be unfounded. Because Ms. DeSanzo had been the subject of a prior, founded complaint, while Ms. Braswell had not, the two were not "similarly situated" and the comparison cannot support a finding of pretext.

<em>iv.    Karen McNeil</em>

Nurse Karen McNeil's disciplinary record has three entries: a verbal warning in July 2015 for absenteeism; a three-day suspension in October 2015 for taking diapers from the hospital for personal use; and, finally, a three-day suspension in September 2016 for conducting "unprofessional conversations while at work," causing "an uncomfortable work environment for her peers." (Doc. 64-34). Contemporaneous with the second suspension, Ms. McNeil was demoted.

Ms. DeSanzo argues that she was treated more harshly than Ms. McNeil because the hospital suspended Ms. McNeil twice before demoting her but demoted Ms. DeSanzo on her first suspension. (Doc. 64 at 22). Again, the comparison is inapt. For one, the offenses involved were not comparable. Ms. McNeil was suspended for using $2.40 worth of diapers. Ms. DeSanzo was suspended because a patient felt that Ms. DeSanzo was condescending and asked to be reassigned. It was Ms. DeSanzo's second customer service complaint in less than a month. Moreover, prior to her first suspension, Ms. McNeil had never been disciplined for a conduct-related offense, let alone a patient complaint. Given these differences, the two were not "similarly situated" when the hospital chose not to demote Ms. McNeil upon her first suspension.

Additionally, Ms. DeSanzo argues that the hospital showed favoritism to Ms. McNeil when it opted to suspend her for taking the diapers even though the hospital's policy calls for termination on a first offense for theft. This argument distorts the hospital's policy, which specifies that discipline recommendations reflect the "typical" case and notes that "[e]xceptions may occur, depending on the nature and seriousness of the offense." (Doc. 52-2 at 42, 43). Ms. Heitgrass testified that she recommended a suspension rather than termination because the value of the supplies was so low. (Doc. 52-8 at 6). Under these circumstances, no reasonable fact finder could construe Ms. Heitgrass's decision as anything more than an exercise of the type of discretion anticipated by the hospital's disciplinary policy.

Because Ms. DeSanzo and Ms. McNeil were not "similarly situated," and the hospital's treatment of McNeil was within the bounds of its discretion under the guidelines, Ms. McNeil's disciplinary record provides no evidence of discrimination.

### c.    Unwarranted Discipline

In further support of Ms. DeSanzo's claim that Ms. Heitgrass and Ms. Jackson targeted her, Ms. DeSanzo argues that several of the disciplinary actions were contrived or otherwise unwarranted. For example, Ms. DeSanzo seems to argue, if obliquely, that Ms. Jackson issued the September 2016 warning without actually investigating the underlying complaint. (*See* Doc. 64 at 16–17). In support of this claim, she notes that Jackson did not obtain a written statement from either L.Y. or her doctor. This is irrelevant. Failure to properly investigate a misconduct allegation before acting on it is not, standing alone, evidence of pretext. The plaintiff must point to some evidence that she was singled out, for instance by pointing to an applicable investigatory policy or procedure, written or unwritten, that the employer failed to follow. *See Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 695 (10th Cir. 2008) (citing *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211,

1222 (10th Cir. 2007). Here, Ms. DeSanzo does not allege, let alone provide evidence, that the hospital's normal practice was to require patients and doctors to complain in writing.

Additionally, Ms. DeSanzo makes much of the fact that some patient records associated with the incident bear a "generated on" date of October 14, suggesting that the hospital suspended DeSanzo before doing any due diligence on the patient's complaint. This is simply a red herring. The time stamp on the records refers to the date they were printed, not the date that her supervisors reviewed the record. (Doc. 52-3 at 29). Those particular records might have been printed in October, but Ms. Jackson viewed them electronically while the patient was still admitted. (*Id.*).

Ms. DeSanzo also argues that the hospital should have ignored patient C.H.'s complaint because she was facing several personal problems. Her chart indicated she had substance abuse and anxiety problems and, according to Ms. DeSanzo, DHS, the state child-welfare agency,was investigating whether the patient could suitably care for her newborn baby, or if DHS would be taking custody of the child." (*See* Doc. 64 at 18, 32). DeSanzo argues that, given the patient's personal issues, the hospital should have discounted her complaint. This argument is a nonstarter.

As a preliminary matter, Ms. DeSanzo's argument misstates the record. The only evidence of any DHS involvement is a note in C.H.'s Care Report indicating that the agency had completed a walkthrough of the patient's home, found it suitable, and cleared the hospital to discharge C.H. with her infant. (Doc. 54-2 at 35). Ms. DeSanzo has not cited, nor was the Court able to find, any evidence in the record indicating that C.H. was in danger of losing custody of her baby. Moreover, Ms. DeSanzo's argument effectively asks the Court to review the hospital's business judgment regarding which complaints are sufficiently credible to be acted upon. This is beyond the scope of the Court's authority. *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). The question is not whether the employer's decision correct; it is whether the stated justification was

sincere. As long as the employer's decision is grounded on the legitimate justification, the correctness, wisdom, or fairness of the decision is irrelevant. *Thompson v. KN Energy*, Inc., 177 F. Supp. 2d 1238, 1258 (D. Kan. 2001).

Ms. DeSanzo attempts to cast doubt on the hospital's sincerity by suggesting that, were another nurse the subject of a complaint by a patient facing similar personal issues, the complaint would have been discounted. (*See* Doc. 64 at 18). Yet again, her claim is not supported by the cited evidence. Ms. Jackson testified that a new mother's loss of custody was one of many factors she would consider when weighing the credibility of a complaint. (Doc. 64-8 at 14). At no point did Ms. Jackson or anyone else involved in the disciplinary process say that DHS involvement renders a patient's complaint unworthy of credence.

With respect to her May 19, 2017 termination, which followed complaints by patient "R.G." and her husband, Ms. DeSanzo argues that her firing "was the most unfounded disciplinary action of all." (Doc. 64 at 33). Ms. DeSanzo asserts that Jackson knew the things R.G. and her husband wanted addressed (a squeaky bed, a beeping IV machine, etc.) were beyond Ms. DeSanzo's ability to control, suggesting that her superiors were looking for any excuse to fire her. (*See* Doc. 64 at 33). Ms. DeSanzo was not fired because she failed to make the chair stop creaking. Rather, the hospital fired her because she responded inappropriately to their concerns.[6] (Doc. 52-2 at 61).

---

[6]    The Disciplinary Action Record indicates she was fired because (1) when the patient had asked for a new bed, Ms. DeSanzo "stated that the department did not get new beds until next year due to budget"; (2) Ms. DeSanzo refused to get the patient a new robe or room; and (3) the patient was concerned that Ms. DeSanzo did not explain why she was discontinuing the patient's IV antibiotics. (Doc. 52-2 at 61). Finally, she was fired because "[t]his complaint came after several coaching sessions on customer service and also written warning and suspension for customer concerns." (*Id.*).

In a second line of attack on her termination, Ms. DeSanzo implies that Jackson made no effort to substantiate the patient's complaint and simply rubberstamped a second-hand report made by another nurse. (*See* Doc. 64 at 33–34). Nurse Jessica Worrall-Elliot reported R.G.'s complaint to Ms. Jackson in an email sent May 8, 2017 at 1:31 p.m., (Doc. 52-2 at 62), and Ms. Jackson testified that she investigated the accusation by following up with the patient in person while doing rounds. (Doc. 52-2 at 30). Ms. DeSanzo, citing no evidence whatsoever, claims that Jackson could not have spoken with R.G. because the patient was no longer in the hospital when Worrall-Elliot reported the complaint. This assertion is plainly meritless, as hospital records show R.G. was not discharged until 7 p.m.—five and a half hours after Ms. Jackson received Worrall-Elliot's email. (Doc. 68-1).

In short, Ms. DeSanzo has failed to come forward with evidence sufficient to support a jury's conclusion that the hospital's stated reason for firing her (repeated complaints of poor customer service) was pretext and that the true reason was impermissible age discrimination. As a result, Southcrest is entitled to judgment as a matter of law regarding Ms. DeSanzo's age discrimination claim.

### B. Retaliation

The ADEA's antiretaliation provision provides as follows:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

29 U.S.C. 623(d).

A plaintiff suing for retaliation "must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987,

998 (10th Cir. 2011)). The plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to [the plaintiff's] interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'" *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir. 2008)); *accord Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013).

A plaintiff establishes a prima facie case of discrimination by producing evidence that (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action to be materially adverse, and (3) a causal connection existed between the protected activity and the challenged action. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). In the absence of direct evidence of retaliatory motive, the plaintiff may establish a causal connection by presenting evidence justifying an inference of retaliatory motive. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). The Supreme Court construes the causation requirement as requiring a showing that the employer's desire to retaliate was the but-for cause of the challenged employment action. *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Ms. DeSanzo has satisfied the first two prongs of her prima facie case. (*See* Doc. 64 at 35). Her October 2016 complaint to Southcrest's human resources department and her submission of a formal Charge of Discrimination to the EEOC both qualify as conduct protected under the statute. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). Likewise, her May 19, 2017 termination qualifies as a materially adverse employment action.

As to the third prong, Ms. DeSanzo seeks primarily to establish the necessary inference of retaliatory motive by showing that, subsequent to her complaint to human resources, she was subjected to disparate treatment. In doing so, she incorporates the arguments presented in support of her discrimination claim. For the reasons explained above, these arguments are unavailing because the comparisons she offers are not legally relevant and she has presented no evidence that her discipline was not, from the perspective of the hospital, warranted.

Ms. DeSanzo does, however, raise three new arguments in support of her retaliation claim. First, she argues that the hospital's withdrawal of her name from a monthly staff recognition program was retaliation for her October 2016 complaint to the human resources department. Second, she argues that a written warning she received in March 2017 for failing to chart in real time was actually a retaliatory strike. Third, she argues that the hospital did not follow its disciplinary policy with respect to several nurses that she accuses of unexcused absences from work.

### 1.    Hero Program

Her first argument relates to the hospital's monthly "healthcare hero" award. Under the program, any staff member or patient can nominate a nurse as a "healthcare hero" by filling out and submitting a card. (Doc. 64-8 at 45–47). The list is then submitted to a committee, which chooses that month's hero. *Id.* According to Ms. DeSanzo, the committee selected Ms. DeSanzo as the hero for December 2016, but Ms. Steward, the HR director, later blocked the award. Because Ms. DeSanzo did not receive the award, Ms. DeSanzo argues this is evidence that she was fired in retaliation for her October 2016 complaint to Human Resources. The Court is not convinced.

For one, Ms. DeSanzo has not provided evidence showing that Ms. Steward made the decision to block the award. She cites a single November 29, 2016 email from Ms. Steward to a person named David Steward. In it, Ms. Steward says, "Can you please take Max Desanzo off of

the hero list for the program. Something happened and we didn't end up giving it to her. Thanks." Ms. DeSanzo has not identified the recipient of the email or explained what role he and Ms. Steward had in the award program. Given the utter lack of context for the email, Ms. DeSanzo's claim that Ms. Steward was the person who made the decision not to name Ms. DeSanzo the December healthcare hero is pure conjecture.

Furthermore, even if Ms. Steward did make the decision to not to present Ms. DeSanzo with the award, this provides no evidence that her termination six months later was retaliatory. At best, one could infer that Ms. Steward withdrew the award in retaliation for the HR complaint, which Ms. Steward had received just a month before. Even that inference is wafer thin. Ms. Steward could have withdrawn the award simply because it would be awkward to have a "healthcare hero" who had just been suspended for poor customer service.

Finally, even if the inference established by her removal from the hero list also applied by some transitive property to Ms. DeSanzo's termination, Southcrest has rebutted that inference by offering evidence that she was fired because she had been the subject of three patient complaints in less than a year. The withdrawal of a purely honorary recognition six months before the adverse employment decision provides no evidence of pretext.

### 2. Failure to Chart

On March 27, 2017, Ms. Jackson issued a written warning to Ms. DeSanzo for charting after her shift was completed despite having been coached on the importance of charting in real time just a month earlier. Southcrest's evidence on this point stands unrebutted by Ms. DeSanzo.

Rather than argue that the after-shift charting never occurred, Ms. DeSanzo argues that she was singled out by Ms. Jackson in retaliation for her age discrimination complaints. As evidence for this claim, Ms. DeSanzo points to the "rebuttal" statement that she submitted in response to the written warning. In it, Ms. DeSanzo asserted that she was being targeted, noting that "[y]ounger

nurses are not written up nor are they even counseled to my knowledge for these same actions."

(Doc. 52-1 at 50). By way of example, she said that "Haley [Meredith] left late two of the same

mornings as did I. She stated to me that she needed to complete some of her charting the following

evening when she came into work." (Doc. 52-1 at 51).

In an attempt to show that her superiors did not follow up on this allegation, thereby

showing that she was being singled out, Ms. DeSanzo claims that Ms. Jackson did not audit Ms.

Meredith's charting history after receiving the rebuttal letter. (*See* Doc. 64 at 37). Ms. DeSanzo,

however, has cited no evidence that supports this assertion.

### 3. Absences

Finally, Ms. DeSanzo argues that the hospital's treatment of younger nurses who were

chronically absent from work shows that she was subjected to disparate discipline. (*See* Doc. 64

at 24, 37). This is futile. The comparators she offers were disciplined for absenteeism, which is on

a different disciplinary track from misconduct offenses. (Doc. 52-2 at 42, 46–47). Because the

comparisons are not legally relevant, the handling of their cases gives rise to no inference of a

retaliatory motive for Ms. DeSanzo's subsequent termination.

### C. Intentional Infliction of Emotional Distress

Under Oklahoma law, a plaintiff claiming intentional infliction of emotional distress must

show "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme

and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the

resulting emotional distress was severe." *See Schovanec v. Archdiocese of Okla. City*, 188 P.3d

158, 175 (Okla. 2008) (quoting *Comput. Publ'ns, Inc. v. Welton*, 49 P.3d 732, 735 (Okla.

2002)). Courts must play a "gatekeeper role" by making an initial determination that the alleged

conduct "may be reasonably regarded as sufficiently extreme and outrageous" to maintain the

claim. *Trentadue v. United States*, 397 F.3d 840, 856 n.7 (10th Cir. 2005).

Ms. DeSanzo presents only a perfunctory argument that the circumstances of her termination qualify as the intentional infliction of emotional distress, citing no case law that would permit a reasonable jury to conclude that the hospital's conduct is extreme and outrageous as defined by Oklahoma law. (*See* Doc. 64 at 38). In order to sustain a claim for IIED, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (quoting Restatement (Second) § 46, cmt. d). Conduct underpinning employment-discrimination claims generally does not rise to the level necessary to support a claim of intentional infliction of emotional distress. *Daniels v. C.L. Frates & Co.*, 641 F. Supp. 2d 1214, 1218 (W.D. Okla. 2009); *see also Miner v. Mid-America Door Co.*, 68 P.3d 212 (Okla. Civ. App. 2003) (claim of intentional infliction of emotional distress was not established despite allegations of sexually explicit verbal abuse and physically threatening conduct by a supervisor); *Eddy v. Brown*, 715 P.2d 74 (Okla. 1986) (allegations of ridicule by supervisor and foreman did not amount to sufficiently outrageous conduct); *Anderson v. Oklahoma Temp. Servs., Inc*, 925 P.2d 574 (Okla. Civ. App. 1996) (six events including lewd remarks about the plaintiff by her supervisor and embarrassing her by discussing her faults with coworkers were insufficiently outrageous); *Mirzaie v. Smith Cogeneration, Inc.,* 962 P.2d 678 (Okla. Civ. App. 1998) (allegations that employer made derogatory sexual comments about plaintiff's fiancée, refused to allow plaintiff a day off of work to be with his wife and newborn son in the hospital, and called plaintiff in the middle of the night, browbeating the plaintiff for hours and requiring him to do unnecessary work, were not sufficiently outrageous to maintain a claim for intentional infliction of emotional distress). In light of this authority, the hospital's alleged conduct—unfairly disciplining Ms. DeSanzo because of her age—

cannot reasonably be regarded as sufficiently extreme and outrageous to sustain her claim. Hence, Southcrest is entitled to judgment as a matter of law.

## IV.     CONCLUSION

For the reasons explained above, the Court finds no genuine factual disputes and concludes that Defendant Southcrest is entitled to judgment as a matter of law on all claims. Accordingly, Southcrest's motion for summary judgment (Doc. 52) is **granted.**

SO ORDERED this 6th day of March, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT